# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **JACOB WINKELMAN, ET AL.,** | ) | **CASE NO. 1:04CV1329** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Judge John M. Manos** |
| | ) | |
| **PARMA CITY SCHOOL DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OF OPINION** |

On March 2, 2005, Plaintiffs, Jeff, Sandee, and Jacob Winkelman (collectively, the

"Winkelmans") filed a Motion for Judgment on the Pleadings Based on the Administrative Record.[1]

---

[1] The Winkelmans actually filed a motion for summary judgment. However, because neither party has expressed a desire to supplement the record, a motion for summary judgment is inappropriate. Dong ex. rel. Dong v. Board of Educ., 197 F.3d 793, 798-99 (6th Cir. 1999). Although the Winkelmans initially sought to supplement the record, their counsel clarified that the request was simply intended to bring to the Court's attention new Sixth Circuit case law. Thus, because the Winkelmans believe that all the necessary facts are set forth in the administrative record, (Brief, Docket No. 35, at 5), the Court will construe their motion as one for judgment based on the administrative record. See id. at 799.

(Docket No. 35.)  On March 17, 2005, Parma City School District ("Parma") filed a Motion for Judgment on the Pleadings Based on the Administrative Record.  (Docket No. 38.)  The issue on appeal is whether or not Parma provided Jacob Winkelman with a free appropriate public education ("FAPE")[2] as mandated under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et. seq., and analogous state law, O.R.C. § 3323.01 et. seq.  The Court has jurisdiction under 28 U.S.C. § 1331.

All issues have been fully briefed and are ripe for adjudication.  For the following reasons, the Winkelmans' Motion for Judgment on the Pleadings Based on the Administrative Record is **DENIED** and Parma's Motion for Judgment on the Pleadings Based on the Administrative Record is **GRANTED**.

## I.  FACTUAL BACKGROUND

Plaintiffs are Jacob Winkelman, a seven-year old boy diagnosed with autism, and his parents, Jeff and Sandee Winkelman.  In July of 2001, Jacob attended preschool at the Achievement Center for Children ("Achievement Center").  Parma paid for this program because Jacob did not respond well to its own program.  Achievement Center offers a special education intervention program including physical therapy, occupational therapy, speech therapy, and music therapy.

On September 1, 2001, Parma school officials met with the Winkelmans to discuss an

---

[2] A "free, appropriate public education" consists of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Board. of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982).

Individualized Education Program ("IEP")³ for Jacob. The parties agreed that Achievement Center was an appropriate placement for the 2001-02 and 2002-03 school years.

On June 2, 2003, the parties met to discuss Jacob's IEP for the 2003-04 school year. The 2003-04 IEP proposed educating Jacob in a special education classroom at Pleasant Valley Elementary School ("Pleasant Valley"). Pleasant Valley is a public school that offers speech and occupational therapy and would provide Jacob with an opportunity to interact with six other students with varying disabilities. The educators at Pleasant Valley are trained to educate children with autism.

The Winkelmans were unhappy with the proposed 2003-04 IEP. Specifically, they complained that the proposed 2003-04 IEP did not include music therapy, did not contain a sufficient amount of speech therapy nor one-on-one interaction, and did not contain any specific plan to implement the need for occupational therapy. Moreover, they preferred placing Jacob at Monarch School. Monarch School is a private school that specializes only in autism and emphasizes one-on-one interaction between students and educators with limited peer interaction. Nonetheless, the Winkelmans signed the proposed 2003-04 IEP and although they objected to his placement, they consented to the initiation services. (Parma's Ex. K before IHO, at 157.)

On June 2, 2003, the Winkelmans filed a request for a due process hearing with Impartial Hearing Officer ("IHO") Joy Freda alleging that Parma failed to provide Jacob with a FAPE. On August 27, 2003, IHO Freda issued an interim order designating Achievement Center as Jacob's stay-put placement. Nonetheless, the Winkelmans unilaterally pulled Jacob from that program and placed

---

³  An "individualized education program" details the services "tailored to the unique needs of the handicapped child." Rowley, 458 U.S. at 181.

-3-

him at Monarch School. Jacob performed well at Monarch School during the 2003-04 school year. However, because of the expense of private education, they did not enroll Jacob in Monarch School for the 2004-05 school year. Presently, Jacob is not enrolled at any school but does participate in a one-to-two hour a week outreach program at Monarch School.

On February 25, 2004, IHO Freda issued a fifty-six page decision finding that Parma provided Jacob with a FAPE and thus, did not violate the mandates of the IDEA. The Winkelmans appealed to State Level Review Officer ("SLRO") Theresa L. Hagen. On June 2, 2004, she issued a forty-four page opinion affirming IHO Freda's decision.

On July 15, 2004, the Winkelmans appealed to this Court. On March 2, 2005, they filed the current motion for judgment on the pleadings based on the administrative record. They are seeking reversal of SLRO Hagen's decision and reimbursement for educating Jacob at Monarch School. On March 27, 2005, Parma filed the current motion for judgment on the pleadings based on the administrative record. It is seeking affirmance of SLRO Hagen's decision in its entirety.

## II.  LEGAL STANDARD

The IDEA's provision governing federal court review over state administrative decisions states: "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C). To prevail on the merits, a plaintiff must establish either that (1) the state has not complied with the IDEA's procedural mandates, or (2) the proposed IEP is not reasonably calculated to enable the child to receive educational benefits. Rowley, 458 U.S. at 206-07.

-4-

Procedural issues are strictly reviewed for compliance; although technical deviations will not render an IEP invalid. Dong, 197 F.3d at 800. Substantive issues are reviewed under a modified *de novo* standard: although the district court is required to make independent decisions based on the preponderance of the evidence, it must give due weight to the determinations made by state administrators. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 763-64 (6th Cir. 2001) (quoting Rowley, 458 U.S. at 206). Accordingly, the Supreme Court has cautioned that although the district court should not simply adopt the findings of fact of the state administrators without re-examining the evidence, it may not simply substitute its own notions of sound educational policy for those of the state hearing officers. Rowley, 458 U.S. at 206.

The burden of proof in the Sixth Circuit rests with the party challenging the terms of the IEP. Dong, 197 F.3d at 799. Here, the burden rests with the Winkelmans. They allege three procedural violations and three substantive violations.

### III. LAW AND ARGUMENT

**A. Procedural Violations**

**1. Use of Assistant**

The Winkelmans argue that IHO Freda violated the procedures set forth in the IDEA by allowing another person to "co-preside" over the proceedings. However, nothing in the record suggests that IHO Freda's research assistant, Ann Oakar, co-presided over the proceedings. Also, nothing in the record suggests that either party objected to the use of a research assistant. To the contrary, IHO Freda's Disclosure Conference Memorandum specifically states that "[a]lso present was Ann Oakar, attorney, an invitee of the hearing officer after consent of both parties." (IHO Ex. 20, at 1)

(emphasis added). At the start of the hearing, IHO Freda again asked the parties if there were any procedural errors that might interfere with the proceeding and both parties responded, "no." (IHO Tr. at 14.)

The Winkelmans' citation to O.A.C. § 3301-51-08 is unavailing. Although O.A.C. § 3301-51-08 details the qualifications and duties of a hearing officer, it does not prohibit the use of a research assistant. Most telling, the Winkelmans are unable to cite a single legal authority that holds that a hearing officer is not allowed to employ a research assistant. Absent any evidence that Ms. Oakar somehow interfered with the process, the Court concludes that the use of a research assistant by an impartial hearing officer does not constitute reversible error.

### 2. Timing Delay

The Winkelmans argue that because the administrative proceeding went 217 days beyond the 45-day deadline, the procedural requirements of the IDEA were violated. The Ohio Administrative Code, Section 3301-51-08 (G)(1)(a) states that "the Ohio Department of Education shall ensure that not later than forty-five days after the receipt of a request for a due process hearing [a] final decision is reached in the hearing." See also 34 C.F.R. § 300.511(a). Section 3301-51-08(G)(3) authorizes the IHO to grant extensions of time beyond the forty-five day requirement. See also 34 C.F.R. § 300.511(c). Section 3301-51-08(G)(3)(b) states that any "extension of time beyond the forty-five days at the request of either party pursuant to this rule shall not be considered a failure to meet timelines."

Here, the Winkelmans requested a due process hearing on June 5, 2003. Thus, the final decision, filed on February 20, 2004, was well beyond the 45-day deadline. However, the first

extension (30 days) was at the request of the Winkelmans so that they could retain counsel. (IHO Exs. 5 & 6.) The second extension (90 days) was at the request of both parties, jointly, so that they could resolve a stay-put placement issue and prepare for the due process hearing. (IHO Exs. 9 & 10.) The third extension (36 days) was, again, at the request of both parties, jointly, so that they could submit briefs. (IHO Ex. 31.) Thus, under the authority of O.A.C. § 3301-51-08 (G)(3)(b), these delays are not to be considered a failure to meet the 45-day deadline.

The fourth (7 days) and fifth (39 days) extensions were at the request of Parma to allow IHO Freda time to thoroughly consider the record, conduct research, and review the evidence. (IHO Ex. 31.) The Winkelmans did not join in these requests, nor did they offer an objection. Given the size of the administrative record, IHO Freda did not err in granting these two requests for additional time. As IHO Freda correctly stated when granting the last extension, Jacob "remains enrolled at Monarch School, the preferred placement of the parents, and is not adversely impacted by this delay." (IHO Ex. 31.) Although the Court does not condone the delay, the IDEA and the Ohio Administrative Code clearly provide some flexibility upon the filing of a motion for good cause. The Court concludes that all extensions were in response to a motion for good cause and that the delay does not constitute reversible error.

Moreover, the Winkelmans have not shown that the delay caused such substantive harm as to deny Jacob a FAPE. See Deal v. Hamilton County Bd. of Edu., 382 F.3d 840, 854 (6th Cir. 2005) (citing Knable, 238 F.3d at 764). The only harm alleged is financial: "[s]uch delay caused [Jacob's] parents to use up all of their resources for providing [Jacob] with an appropriate education at the Monarch School, which has resulted in [Jacob] not having any services for extended school year

-7-

services for 2004 and not having any services for the 2004-2005 school year." (Brief, Docket No. 35, at 5.) However, when Jacob was enrolled at Monarch School, a place for him was available at the Achievement Center. In violation of IHO Freda's August 27, 2003 stay-put placement order, the Winkelmans unilaterally pulled Jacob from the Achievement Center and placed him at Monarch School. The Supreme Court has held that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." School Comm. of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 373-74 (1985). Thus, any financial harm suffered by the Winkelmans is a result of their own doing and not a result of IHO Freda's delay.

### 3. Predetermination

The Winkelmans argue that Parma predetermined to place Jacob in its own program prior to developing his 2003-04 IEP. The Sixth Circuit has held that predetermining not to offer a child certain services without effective participation by the parents amounts to a procedural violation of the IDEA and causes such substantive harm as to deprive the child a FAPE. See Deal, 392 F.3d at 855-59. However, the Winkelmans did not raise this issue with IHO Freda, nor with SLRO Hagen. District courts are not authorized to rule upon issues beyond those presented to the IHO and SLRO. Metropolitan Bd. of Pub. Educ. v. Guest By & Through Guest, 193 F.3d 457, 463 (6th Cir. 1999). As the Sixth Circuit reasoned, "[w]ere federal courts to set themselves up as the initial arbiters of the handicapped children's educational needs before the administrative process is used, they would endanger not only the procedural but also the substantive purposes of the Act." Crocker v. Tennessee Secondary Sch. Athletic Ass'n, 873 F.2d 933, 935 (6th Cir. 1989). Parma has never had an

opportunity to defend itself against allegations of predetermination. Although the Court is authorized to hear new evidence, the Sixth Circuit is clear that new evidence cannot be heard on issues never presented to the IHO or SLRO. Guest, 193 F.3d at 463. Thus, the Court lacks jurisdiction to address this issue.

Even if the Court had jurisdiction, the administrative record does not support an allegation of predetermination. First, the Winkelmans were able to participate at every step of Jacob's education. They were present at the 2003-04 IEP meetings and consented to the initiation of services. (Parma's Ex. K before IHO, at 154.) Second, Parma readily paid to enroll Jacob at the Achievement Center when it was shown that Jacob was not responding well to its own program. Third, there is no evidence that Parma has a predisposition against placing a child at Monarch School. Mrs. Winkelman did not even begin to consider Monarch School until after the June 2, 2003 IEP meeting. (Tr. at 81.) She also testified that Dr. Judith Hudgins, Parma's Special Education Supervisor, did not discourage her from looking into other programs. (Tr. at 47.) Finally, Susan Rueger, Pleasant Valley's principal, testified that Pleasant Valley would provide any service that Jacob's IEP required. (Tr. at 648-49.)

In short, this is a far cry from the situation in Deal where the Sixth Circuit found (1) numerous procedural and substantive errors, (2) that the school district had an unofficial policy of refusing to consider certain programs regardless of the child's needs, and (3) that the district's main concern was financial. 392 F.3d at 855-59. Indeed, in Deal, the parents were not even allowed to ask questions during the IEP meetings. Id. at 855. Thus, even if the Court had jurisdiction over this issue, the record does not support an allegation of predetermination.

### B.    Substantive Violations

#### 1.    Occupational Therapy

The parties agree that Jacob's 2003-04 IEP did not contain specific goals and objectives for occupational therapy.  Instead, it guaranteed to assess Jacob for occupational therapy and mandated that such assessment be completed within thirty days of the new school year.  The issue is whether or not a guarantee to assess Jacob for occupational therapy as opposed to setting forth specific goals and objectives constitutes a substantive violation and denies Jacob a FAPE.

An IEP is defined as a "written statement for a child with a disability that is developed, reviewed, and revised in accordance with section [1414(d)]."  20 U.S.C. § 1401(14).  It must include:

> (1) a statement of the present levels of educational performance of the child, (2) a statement of annual goals, including short-term instructional objectives (3) a statement of the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs, ... (5) the projected date for initiation and anticipated duration of these services, and (6) appropriate objective criteria and evaluation procedures for schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

34 C.F.R. § 222.50 (2005); Cleveland Heights-University Heights City Sch. Dist. v. Boss by & through Boss, 144 F.3d 391, 398 (6th Cir. 1998).  "Related services" include "transportation and such developmental, corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children."  20 U.S.C. § 1401(26)(A). "Occupational therapy" is considered a "related service."  Specifically, "occupational therapy" includes "(1) improving, developing or restoring functions impaired or lost through illness, injury, or deprivation, (2) improving ability to perform tasks for independent functioning if functions are impaired or lost, and (3) preventing, through early

intervention, initial or further impairment or loss of function." 34 C.F.R. § 300.24(5) (2005).

Here, Jacob's 2003-04 IEP identifies his present performance levels for occupational therapy. It also indicates that occupational therapy is a necessary related service. (Parma's Ex. K before IHO, at 157). However, instead of providing annual goals, short-term objectives, and a description of the services to be provided, it only recommends that Jacob be assessed for occupational therapy within the first month of the new school year. Id. at 145; 149. The Winkelmans consented to this portion of the IEP. Id. at 154.

> Julia Peacock, Parma's occupational therapist, explained the reason for the delay:
>
> I was not comfortable writing IEP goals ... because I had never seen Jacob and was not comfortable writing goals on what the OT currently had goals on because they were things like tying his shoes which at five to six, you should be working on, but he shouldn't actually quite know how to do it yet. It would be good if he could. Cutting out squares and things like that, I really wanted to see where he was at before I put on goals. He might need harder goals, and I really wanted to look at where the problems were occurring instead of just putting on a goal. If it was a sensory problem we needed to attack it from more of a sensory issue and not just cutting on a line.
>
> . . .
>
> This was a new environment, and we weren't sure how he was going to transition. So, there was no point to putting that in until we knew how he did in the beginning and figured out how to modify the environment for him. ... [T]his is very typical; that we think it's best to do it when we get to know the child a little bit and he has been here for a while and we see how he is actually doing and what problems he is having.

(IHO Tr. at 297-98.)

Based on this testimony, IHO Freda concluded that the lack of specific goals and objectives for occupational therapy constituted a procedural technical violation of the IDEA as opposed to a substantive violation. She provided four reasons to support her conclusion. First, she found Ms.

-11-

Peacock to be a very credible witness who wanted to set new goals for Jacob reflecting his current levels of performance within the scope of his new environment as opposed to simply recycling old goals.  Second, she agreed that "the assessment of [Jacob's] abilities and adaptation to his new environment are the most important factors in the creation of appropriate goals and objectives."  (IHO decision, at 48.)  Obviously, measuring Jacob's level of adaptation to his new school environment required Ms. Peacock to first observe him in his new environment, thus justifying the delay.  Third, she concluded that because Jacob's motor skills were on par with the majority of motor skills required for kindergarten-readiness, he would not be significantly impacted by the thirty-day delay.  Rather, she found that "the overall impact on the child's long-term progress may be greater with the development of goals and objectives based on timely data and tailored to the child's unique needs."  (IHO decision, at 49.)  Finally, she noted that the Winkelmans consented to the initiation of services.

Two Sixth Circuit cases are instructive on this point.  In Doe v. Defendant I, 898 F.2d 1186 (6th Cir. 1990), the court held that an IEP that did not include present educational performance levels and objective criteria for determining whether instructional goals were being met constituted a mere technical violation of the IDEA.  The court reasoned that the absent information was known to all parties and that the parents had actually requested the delay so that their child could first adjust to the new experience of middle school.  Id. at 1189.  Also the court reasoned that emphasis should be placed on "the process by which the IEP is produced rather than the myriad of technical items that must be included in the written document."  Id. at 1190.

However, in Cleveland Heights-University Heights City Sch. Dist. v. Boss by & through Boss, 144 F.3d 391 (6th Cir. 1998), the court held that an IEP that did not include objective criteria for

-12-

determining whether instructional goals were being met constituted a substantive violation of the IDEA and denied the child a FAPE. The court reasoned that the omitted information went to the heart of the substance of the IEP. Id. at 399. Moreover, unlike the situation in Defendant I, the parents refused to approve the IEP. Id. at 394. Also, unlike the situation in Defendant I, both state administrative officers ruled in favor of the parents. Id. at 398. Under the IDEA's deferential standard of review, federal courts are required to give these state administrative decisions due weight. Finally, the Sixth Circuit noted that the school district refused to reassess the IEP until three months after the school year had started. Id.

The Court concludes that the present situation is more akin to the situation in Defendant I than in Boss. First, the absent information was known to the Winkelmans and still, they did not object to the implementation of services. See e.g. Berger v. Medina City Sch. Dist., 348 F.3d 513, 520 (6th Cir. 2003). Second, both state administrative officers ruled in favor of the school district and their decisions require some deference. Third, the reason for the delay was to allow Jacob time to adjust to his new school environment. Finally, unlike the three month delay in Boss, Parma agreed to re-assess Jacob within the first month of the new school year.

The Winkelmans argue that affirming the decisions of the state administrative officers "will set a dangerous precedent allowing school administrators to place handicapped children in school without first developing the statutorily mandated goals and objectives and without first detailing the provisions for services to be provided." (Brief, Docket No. 35, at 13.) They raise a valid concern. Indeed, IHO Freda stated that identifying a needed service and then delaying the creation of goals and objectives is not the "preferred practice." (IHO Decision, at 48.) Nonetheless, the entire IEP team (with initial

consent by the Winkelmans) and both state administrative officers all agreed that the one month delay was in the best interest of Jacob. The Court must give these determinations due weight. Knable, 238 F.3d at 763-64 (quoting Rowley, 458 U.S. at 206).

In doing so, the Court does not wish to make light of the procedural and substantive requirements of the IDEA. However, given that Jacob was entering a completely new school setting and given the overall consensus that the one-month reassessment was in his best interest, the Court concludes that the lack of goals and objectives for occupational therapy only constitutes a procedural technical violation of the IDEA and not reversible error. As the Sixth Circuit stated, to say that such technical deviations render an IEP invalid "is to exalt form over substance." Defendant I, 898 F.2d at 1190.

### 2. Speech Therapy and Academics

The Winkelmans argue that the reduction of speech therapy from 90 minutes to 60 minutes and the lack of one-on-one academic instruction constitutes a substantive violation of the IDEA and denies Jacob a FAPE.

"Speech-language pathology services" is considered a "related service" and includes "(1) identification of children with speech and language impairments, (2) diagnosis and appraisal of specific speech and language impairments, (3) referral for medical or other professional attention necessary for the habilitation of speech or language impairments, (4) provision of speech and language services for the habilitation or prevention of communicative impairments, and (5) counseling and guidance of parents, children, and teachers regarding speech and language impairments." 34 C.F.R. § 300.24(14) (2005).

There is no dispute that the 2003-04 IEP, with regard to speech therapy, satisfies the requirements of 34 C.F.R. § 222.50. The only issue is whether or not Jacob can receive some educational benefits from 60 minutes of speech therapy.

The recommendation of 60 minutes per week came from Michelle Munci, Parma's speech language pathologist:

> I can tell you what I thought when I wrote 60 minutes. Jacob being placed in the classroom, he would be receiving speech, and these goals would be carried through throughout his entire day anyway just like it was at the Achievement Center. I felt I needed the 60 minutes to do more specialized training, but that he would still be receiving speech contact because the teachers carry through these things the entire day. They are very language classrooms.

(Tr. at 282.) She based her conclusions on (1) discussions with Jacob's teacher and speech pathologist at Achievement Center, (2) data from the Achievement Center and Parma, and (3) personal observations. (Tr. at 286-87.)

No evidence in the record suggests that Jacob requires 90 minutes of speech therapy per week to receive educational benefits. Although he was receiving 90 minutes per week at the Achievement Center, that was the standard amount for all children there. (Tr. at 473-74.) As IHO Freda correctly noted, the fact that Jacob was progressing with 90 minutes of speech therapy at the Achievement Center does not mean that 60 minutes would offer him no educational benefits. (IHO decision, at 46.) Obviously, more time would most likely produce more results, but as the Sixth Circuit stated, a school district is only required to "provide the educational equivalent of a serviceable Chevrolet ... [i]t is not required to provide a Cadillac." Doe v. Board of Educ. of Tullahoma City Sch., 9 F.3d 455, 459-60 (6th Cir. 1993). Absent any evidence that Jacob actually needs 90 minutes of speech therapy per week

to receive educational benefits, IHO Freda did not err in concluding that 60 minutes would still provide Jacob a FAPE.

The Winkelmans also take issue with the lack of one-on-one academic training in Jacob's 2003-04 IEP.  This issue goes to the heart of the dispute between the parties.  Parma prefers placing Jacob at Pleasant Valley, which focuses on peer interaction.  The Winkelmans prefer placing Jacob at Monarch School, which provides almost no opportunity for peer interaction.

Julie d'Aliberti, Pleasant Valley's kindergarten teacher, testified that "as far as [Jacob's] social and communicative needs, it appears that he would mesh very well with the other students in my classroom due to what I know their needs are and what their levels are."  (Tr. at 546.)  Michelle Munci, Parma's speech language pathologist, testified that Jacob was successful in small group activities when she observed him at Achievement Center.  (Tr. at 269.)  She concluded that Jacob would perform well at Pleasant Valley because "he needs to learn how to interact better with peers."  (Tr. at 275-76.)  All of the witnesses unanimously agreed that learning to interact with peers is one of Jacob's most important needs.  (Munci, Tr. at 275-76; Gerber, Tr. at 461; Lumadue, Tr. at 247; Mendell, Tr. at 198; Alspach, Tr. at 159.)  As Amy Marie Lumadue, a mental health therapist at Beech Brook Mental Health Center, aptly stated, "life is not a one on one setting."  (Tr. at 255.)

Although Jacquelyn Gerber, Jacob's preschool teacher at the Achievement Center, Ms. Lumadue, Debra J. Mandell, director at Monarch School, and Jaime Alspach, a music therapist at Music Therapy Enrichment Center, all testified that Jacob tends to learn better in a one-on-one setting, (Tr. at 436-37, 249-50, 198-99, 151), none of these witnesses testified that Jacob needs a one-on-one setting to receive educational benefits.  To the contrary, Ms. Gerber conceded that Jacob could

-16-

succeed at Pleasant Valley if the program remained structured. (Tr. at 464-65.) Ms. Mendell conceded that Jacob was doing well in his small group instruction period and that he could learn from a program that included more peer interaction. (Tr. at 199, 214.) Finally, Ms. Alspach stated that Jacob enjoyed being with his peers and that he would certainly benefit from more peer interaction. (Tr. at 151, 159.)

The only witness who was adamant that Jacob needed one-on-one interaction to receive any educational benefits was Dr. Morris Levinsohn, Jacob's pediatric neurologist. He gave his "firm medical recommendation" that one-on-one instruction was critical for Jacob to be successful in a school setting. (Tr. at 314, 342-43.) IHO Freda was not persuaded by his testimony. She reasoned that he is not an educator, he only had limited personal interaction with Jacob, and he had never observed Jacob in a classroom setting. More importantly, most of his information regarding Jacob came from the Winkelmans. For example, he only recommended music therapy because the Winkelmans told him that Jacob likes music. (Tr. at 326.)

> In evaluating all of this evidence, IHO Freda made the following conclusions:
>
> Again, there is no evidence that the child needs a set amount of one-on-one instructional time to receive a [FAPE]. While it is in fact a truism that any child would receive educational benefit from significant amounts of one-to-one instruction, the IDEA does not require an ideal education or the best education available for a certain child.
>
> . . .
>
> The school district's proposed placement of the child for the 2003-2004 school year involves a special education classroom consisting of six to eight students with a teacher and two aides. One-to-one and small group instruction would be provided throughout the day; in addition, the child would be exposed to both disabled and nondisabled peers and would be afforded the opportunity to generalize his social and language skills across diverse environments.

-17-

. . .

>Pleasant Valley Elementary School is not only appropriate as the least restrictive environment, but is <u>clearly</u> <u>preferable</u> to the parents' choice of Monarch School where the child is instructed in a one-on-one environment for the greater part of the day.

(IHO Decision, at 42-45) (emphasis added.)

Given the overwhelming consensus that Jacob needs more peer interaction and that he would receive some educational benefits from Pleasant Valley, the Court concludes that IHO Freda did not err in finding that Pleasant Valley is an appropriate placement for Jacob, despite the reduced amount of one-on-one instruction.  Also, contrary to the Winkelmans' assertion, IHO Freda was not required by law to rely Dr. Levinsohn's testimony.  Rather, she was well within her right to disregard it based on his lack of expertise in education, his limited personal interaction with Jacob, and the fact that he never observed Jacob in an educational setting.  Indeed, a finding of witness credibility is seldom subject to review.  See United States v. Gessa, 57 F.3d 493, 496 (6th Cir. 1995).

### 3.  Music Therapy

The Winkelmans argue that the lack of music therapy in Jacob's 2003-04 IEP constitutes a substantive violation of the IDEA and denies Jacob a FAPE.  Music therapy is a "related service" and only necessary if the child needs the service to receive educational benefits.  Neeley v. Rutherford County Sch., 68 F.3d 965, 969 (6th Cir. 1995).  Music therapy was provided for in Jacob's 2001-02 IEP and 2002-03 IEP (Parma's Exs. G and I before IHO).  However, no music therapy was provided for Jacob in his 2003-04 IEP.  The question is whether or not Jacob needs music therapy to receive educational benefits.

Jaime Alspach, Jacob's music therapist at the Music Therapy Enrichment Center, testified that music therapy was put into Jacob's 2001-02 IEP and 2002-03 IEP because

> [I]t was shown that music was motivating to him, provided structure to him that allowed to work better on his objectives, and from anecdotal data as well as data we saw, he was often performing better on IEP objectives within the music setting than in a nonmusic setting, perhaps the speech or with a teacher.

(Tr. at 156.) However, she conceded that it was not necessary to sing to Jacob for him to understand things. (Tr. at 157.) Mary Beth Koss, the manager of the education department at the Achievement Center, and Ms. Gerber, Jacob's preschool teacher, both agreed that although music therapy certainly aided Jacob, he could still learn outside the music therapy context and pick up skills without the use of music. (Tr. at 398, 450.) Contrary to the Winkelmans' claim, neither Ms. Mendell from Monarch School nor Ms. Lumadue from Beech Brook testified that Jacob needs music therapy to receive educational benefits. The only witness who testified as such was Dr. Levinsohn. The Court has already concluded that IHO Freda was permitted to disregard his testimony because his recommendation was not based on any personal observations but solely on the fact that he was told that Jacob likes music. (Tr. at 325-26.) Moreover, Dr. Levinsohn is not an expert in education.

It is quite evident that Jacob loves and responds well to music. (McNulty, Tr. at 100; Alspach, Tr. at 147; MacGuire, Tr. at 175; Lumadue, Tr. at 251; Gerber, Tr. at 421, 450, 469.) Fortunately, Jacob's would-be teacher at Pleasant Valley incorporates music into her lesson plans. (Tr. at 529.) Also, Pleasant Valley offers an adaptive music class geared for children with autism. (Tr. at 496.) These services should be very beneficial to Jacob. However, the record does not support the notion that Jacob needs music therapy to receive educational benefits. The only witness to testify to that effect

was Dr. Levinsohn, whose testimony was permissibly disregarded by IHO Freda. Thus, the fact that Jacob's 2003-04 IEP did not include music therapy does not constitute reversible error nor deny him a FAPE.

## IV. CONCLUSION

For the following reasons, Plaintiffs' Motion for Judgment on the Pleadings Based on the Administrative Record (and request for reimbursement) is **DENIED**; and Defendant's Motion for Judgment on the Pleadings Based on the Administrative Record is **GRANTED**. Each party to bear its own costs.

**IT IS SO ORDERED.**

**Date: June 2, 2005**               */s/ John M. Manos*
                                     **UNITED STATED DISTRICT JUDGE**